**INTERGRAPH CORPORATION,**
**Plaintiff–Appellee,**

v.

**INTEL CORPORATION, Defendant–**
**Appellant.**

No. 98–1308.

United States Court of Appeals,
Federal Circuit.

Nov. 5, 1999.

William L. Jaeger, Townsend and Townsend and Crew LLP, argued for plaintiff-appellee. Of counsel on the brief were David Vance Lucas, Senior Counsel, Intergraph Corporation, of Huntsville, Alabama; and John G. Roberts, Jr., Hogan & Hartson L.L.P., of Washington, DC.

Marc G. Schildkraut, Howrey & Simon, of Washington, DC, argued for defendant-appellant. With him on the brief was Joel M. Freed. Of counsel on the brief were Peter N. Detkin and Thomas C. Reynolds, Intel Corporation, of Santa Clara, California.

Lars H. Liebeler, Thaler & Liebeler, of Washington, DC, amicus curiae for Computing Technology Industry Association–Technology Access Action Coalition.

Before NEWMAN, Circuit Judge, SMITH, Senior Circuit Judge,* and PLAGER, Circuit Judge.

PAULINE NEWMAN, Circuit Judge.

Intel Corporation appeals the grant of a preliminary injunction by the United States District Court for the Northern District of Alabama.[1] We vacate the injunction.

Intel is a manufacturer of high performance computer microprocessors. The microprocessors are sold to producers of various computer-based devices, who adapt and integrate the microprocessors into products that are designed and sold for particular uses. These producers are called original equipment manufacturers, or OEMs. Intergraph Corporation is an OEM, and develops, makes, and sells computer workstations that are used in producing computer-aided graphics. From 1987 to 1993 Intergraph's worksta-

1. *Intergraph Corp. v. Intel Corp.,* 3 F.Supp.2d 1255 (N.D.Ala.1998).

tions were based on a high performance microprocessor developed by the Fairchild division of National Semiconductor, embodying what is called the "Clipper" technology. Intergraph owns the Clipper technology and patents thereon. In 1993 Intergraph discontinued use of Clipper microprocessors in its workstations and switched to Intel microprocessors. In 1994 Intel designated Intergraph a "strategic customer" and provided Intergraph with various special benefits, including proprietary information and products, under non-disclosure agreements.

Starting in late 1996 Intergraph charged several Intel OEM customers with infringement of the Clipper patents based on their use of Intel microprocessors. The accused companies sought defense and indemnification from Intel. Negotiations ensued between Intel and Intergraph. Intel inquired about a license to the Clipper patents, but the proposed terms were rejected by Intergraph as inadequate. Intel then proposed certain patent cross-licenses, also rejected by Intergraph. Intel also proposed that the non-disclosure agreement relating to a new joint development project include a license to the Clipper patents; this too was rejected by Intergraph. As negotiations failed and threats continued the relationship deteriorated, and so did the technical assistance and other special benefits that Intel had been providing to Intergraph.

In November 1997 Intergraph sued Intel for infringement of the Clipper patents. Intergraph also charged Intel with other violations of law, including fraud, misappropriation of trade secrets, negligence, wantonness and willfulness, breach of contract, intentional interference with business relations, breach of express and implied warranties, and violation of the Alabama Trade Secrets Act. Intergraph demanded that Intel be enjoined from infringement of the Clipper patents, and the award of compensatory and punitive damages and trebled damages.

Intergraph moved to enjoin Intel *pendente lite* from cutting off or delaying provision of the special benefits that Intel had previously provided to Intergraph. Following Intel's opposition to this motion Intergraph amended its complaint to charge Intel with violation of the antitrust laws. After a hearing, the district court held that Intel was a monopolist and had violated sections 1 and 2 of the Sherman Act or was likely to be so shown, and issued a preliminary injunction that included the following provisions:

a. Intel shall supply Intergraph with all Intel product information, including but not limited to technical, design, development, defect, specification, support, supply, future product, product release or sample data, whether existing in product data books, "yellow backs," Confidential Information Transmittal Records, email or other mediums ..., whether it is on an advance basis for the development of motherboards, graphics subsystems or workstations utilizing Intel's existing, or future generation products (hereinafter "Product Development"), or current products as needed for support of such products....

\* \* \* \* \* \*

c. Intel shall supply Intergraph with an allocation, and set aside a supply of microprocessors, semiconductors, chips, and buses (hereinafter "Chips") on an advance basis for product development ("Chips Samples"), in such quantities as forecasted by Intergraph in the same manner and the same terms as is done by Intergraph's similarly situated Competitors,....

d. Within eleven (11) days of the date on which Intergraph posts the bond, as required by subsection (h) of this order, Intel shall supply Intergraph with 25 sets of Deschutes Chips Samples, together with all technical data needed to permit Intergraph to develop, design, and manufacture its products....

e. Intel shall supply Intergraph with an allocation, and set aside a supply, of Chips which have been manufactured by or on behalf of Intel for distribution (hereinafter "Production Chips"), as well

as all future chips proposed by, or available from Intel, including but not limited to 333mhz Pentium II, BX, Deschutes and Merced Chips, in accordance with a forecast supplied by Intergraph. . . .

\* \* \* \* \* \*

> (ii) Intel shall supply Intergraph with Production Chips not yet available from Intel's authorized distributors ("Early Production Chips") in such quantities as forecasted by Intergraph, or in proportional quantities as supplied to Intergraph's similarly situated Competitors, . . .

\* \* \* \* \* \*

i. Intergraph shall maintain the confidentiality of all Information, Third Party Information, Chip Samples and Early Production Chips, in accordance with the terms, conditions and procedures of the applicable non-disclosure agreements as previously agreed to by the parties. . . .

Intel appeals, arguing that no law requires it to give such special benefits, including its trade secrets, proprietary information, intellectual property, pre-release products, allocation of new products, and other preferences, to an entity that is suing it on charges of multiple wrongdoing and is demanding damages and the shutdown of its core business. Intel states that its commercial response to Intergraph's suit is not an antitrust violation, and that this "garden-variety patent dispute" does not warrant the antitrust remedy here imposed. Intel also states that the scope of the injunction far exceeds the special benefits that had previously been accorded to Intergraph, and that it is unworkable, as well as unfair to Intel's overall business relationships, for the court to promote Intergraph to a disproportionately favored position.

Intergraph's response is that it can not survive in its highly competitive graphics workstation business without these services and benefits from Intel, and that the district court simply acted to preserve Intergraph's prior commercial position while the parties litigate unrelated patent issues.

Intergraph states that the national interest requires that patentees be free to enforce their patents without risk of retaliatory commercial response from the accused infringer. Intel disputes these premises, and also points out the incongruity of Intergraph's statement that it is essential to Intergraph's business that it have the products for which it is demanding the shutdown of Intel's production.

### *Standard of Review*

■ On appellate review, except for issues within the Federal Circuit's exclusive jurisdiction we apply the discernable law of the regional circuit. *See Mikohn Gaming Corp. v. Acres Gaming, Inc.,* 165 F.3d 891, 894, 49 USPQ2d 1308, 1310 (Fed.Cir. 1998) (applying regional circuit law to review of a preliminary injunction); *Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059, 1067, 46 USPQ2d 1097, 1103 (Fed.Cir.1998) (*en banc*) (applying regional circuit law to antitrust issues except for issues concerning patents).

■ In *Lucero v. Operation Rescue,* 954 F.2d 624, 627 (11th Cir.1992) the Eleventh Circuit summarized the criteria for grant of a preliminary injunction as (1) the party seeking the injunction has shown a substantial likelihood of success on the merits, (2) there is a substantial threat of irreparable injury in absence of the injunction, (3) the balance of harms favors the party seeking the injunction, and (4) entry of the injunction does not disserve the public interest. These criteria apply to antitrust issues as to other areas of law. *See DFW Metro Line Serv. v. Southwestern Bell Telephone Co.,* 901 F.2d 1267, 1269 (5th Cir.1990) ("The traditional prerequisites for injunctive relief are applicable to antitrust cases.") The burden of establishing entitlement to the injunction is on the movant. *Nnadi v. Richter,* 976 F.2d 682, 690 (11th Cir.1992).

■ The grant of a preliminary injunction is reviewed on the standard of abuse of discretion. This standard requires plenary review of the correctness of the district court's rulings on matters of law, including the correctness of the legal crite-

ria used in evaluating the likelihood of success on the merits. *See Bah v. City of Atlanta,* 103 F.3d 964, 966 (11th Cir.1997) ("A district court necessarily abuses its discretion when it bases a ruling on an erroneous view of the law. Any legal determinations made by the district court in ruling on a preliminary injunction are reviewed de novo.") (citations omitted); *Jove Engineering, Inc. v. IRS,* 92 F.3d 1539, 1546 (11th Cir.1996) (" 'A district court abuses its discretion when it misconstrues its proper role, ignores or misunderstands the relevant evidence, and bases its decision upon considerations having little factual support.' ") (quoting *Arlook v. S. Lichtenberg & Co.,* 952 F.2d 367, 374 (11th Cir.1992)).

While recognizing that an appropriate range of discretionary authority is possessed by the trial court in weighing and balancing the criteria of relief *pendente lite,* the Eleventh Circuit has not generally used a "sliding scale" wherein the severity of the hardship may lessen the showing of likelihood of success on the merits. In *Snook v. Trust Co. of Georgia Bank, N.A.,* 909 F.2d 480, 483 n. 3 (11th Cir.1990) the court stated that the sliding scale has not been adopted by the Eleventh Circuit. Intergraph disputes the validity of this Eleventh Circuit practice, suggesting that earlier Fifth Circuit decisions recognizing a sliding scale should be deemed in effect in the Eleventh Circuit because they were not overruled *en banc.* However, we take note that the Eleventh Circuit has consistently held that for preliminary relief a substantial likelihood of success on the

merits must be shown. *See, e.g., Tefel v. Reno,* 180 F.3d 1286, 1295 (11th Cir.1999) ("A party seeking a preliminary injunction must establish the following four factors: (1) a substantial likelihood of success on the merits, (2) a threat of irreparable injury, (3) that its own injury would outweigh the injury to the nonmovant, and (4) that the injunction would not disserve the public interest."); *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir.1998) (same). Thus we review whether, on the record before the district court, Intergraph established a substantial likelihood of success on the merits of its antitrust claims. *See Warren Publ'g, Inc. v. Microdos Data Corp.,* 115 F.3d 1509, 1516 (11th Cir.1997) (*en banc* ) ("Because we conclude that Warren failed to establish a substantial likelihood of success on the merits, we need not address the additional elements required for a preliminary injunction.")

We conclude that the antitrust rulings of the district court are incorrect in law or are devoid of sufficient factual support to present a substantial likelihood of establishing an antitrust law violation with respect to the issues presented. We also conclude that the district court's alternate contract-based ground for the injunction is unsupported on the facts presented.

### Intel as "Monopolist"

The district court ruled that Intergraph is likely to succeed in showing that Intel is a "monopolist," whereby Intel's withdrawal of the benefits it had previously accorded to Intergraph and other actions were deemed to violate sections 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1, 2.[2] The

---

2. **Section 1.** Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

**Section 2.** Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

court relied on several legal theories, *viz.:* (1) the essential facility theory and the corollary theory of refusal to deal, (2) leveraging and tying, (3) coercive reciprocity, (4) conspiracy and other acts in restraint of trade, (5) improper use of intellectual property, and (6) retaliatory enforcement of the non-disclosure agreements. The court alternatively ruled that Intergraph is likely to succeed on its contract claims, including the claim that the mutual at-will termination provision of the non-disclosure agreements is unconscionable. While the parties dispute some of the factual determinations of the district court, the court's dispositive rulings were made as a matter of law, and are subject to plenary review.

■ Intel states that unlawful monopolization was not shown, as a matter of law, because Intergraph and Intel are not competitors. Unlawful monopolization requires both the existence of monopoly power and anticompetitive conduct. *See* 3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law,* & 650a, at 66 (1996) ("Unlawful monopolization under § 2 of the Sherman Act requires both power and 'exclusionary' or anticompetitive conduct before any kind of relief is appropriate.") Monopoly power is generally defined as the power to control prices or exclude competition in a relevant market; anticompetitive conduct is generally defined as conduct whose purpose is to acquire or preserve the power to control prices or exclude competition. *Id.* at 67 ("[T]he relevant conduct is often described as 'exclusionary' in the sense that it impairs the opportunities of rivals and is neither 'competition on the merits' nor more restrictive than reasonably necessary for such competition.") The prohibited conduct must be directed toward competitors and must be intended to injure competition. *See Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 458, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993) ("The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.")

■ Such conduct must affect the relevant product market, that is, the "area of effective competition" between the defendant and plaintiff. *See American Key Corp. v. Cole Nat'l Corp.,* 762 F.2d 1569, 1581 (11th Cir.1985) ("The relevant market is the 'area of effective competition' in which competitors generally are willing to compete for the consumer potential.") (quoting *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327–29, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961)); *see also, e.g., AD/SAT, Div. of Skylight, Inc. v. Associated Press,* 181 F.3d 216, 227 (2d Cir.1999) ("The relevant market for purposes of antitrust litigation is the 'area of effective competition' within which the defendant operates.") In *Brown Shoe Co. v. United States,* 370 U.S. 294, 324, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) the Court summarized that the relevant market has two dimensions: first, the relevant product market, which identifies the products or services that compete with each other; and second, the geographic market, which may be relevant when the competition is geographically confined. Thus "the 'market' which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration." *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 404, 76 S.Ct. 994, 100 L.Ed. 1264 (1956).

■ The antitrust law has consistently recognized that a producer's advantageous or dominant market position based on superiority of a commercial product and ensuing market demand is not the illegal use of monopoly power prohibited by the Sherman Act. In *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 596 n. 19, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) the Court explained that "[t]he offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or

historic accident," quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Product superiority and the ensuing market position, flowing from a company's research, talents, commercial efforts, and financial commitments, do not convert the successful enterprise into an illegal monopolist under the Sherman Act.

■ Intel does not dispute the high market share achieved by its high performance microprocessors. However, that is not a violation of law. Intel stresses that it is not in competition with Intergraph in any relevant market; that its relationship with Intergraph is that of supplier and customer, not competitor. Although the district court found that Intel and Intergraph compete or will compete in the future in the "graphics subsystems" market, as we discuss *post,* Intel points out, and Intergraph does not dispute, that neither firm possesses monopoly power in this market. Intel stresses that violation of the Sherman Act requires the use of monopoly power to exclude competition or maintain prices, *see* Areeda, *Antitrust Law,* & 650a at 66, none of which is here alleged.

Although the district court recognized that Intel's market power derives from the technological superiority of its products, the court found a *prima facie* case of market power based on Intel's market share of high performance microprocessors, and concluded that Intel had willfully acquired and maintained monopoly power in the high-end microprocessor market, although the record did not show an effect on competition in any market in which Intergraph competes with Intel. The district court concluded that "[a] sixty to sixty-five percent market share establishes a *prima facie* case of market power and creates a genuine issue of dangerous probability of monopolization," 3 F.Supp.2d at 1275, citing *U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.,* 7 F.3d 986, 999 (11th Cir. 1993). In *U.S. Anchor* the defendant was accused of attempting to monopolize the market for certain types of anchors that

were also sold by the plaintiff, through predatory pricing and tying arrangements; the court held that a sixty to sixty-five percent share of the market was sufficient to present a jury question on the issue of attempted monopolization, thus precluding summary judgment for the defendant. However, the court did not eliminate the requirement that plaintiff and defendant compete in the relevant market; that fundamental premise underlies *U.S. Anchor.*

Intel's market power in the microprocessor market is irrelevant to the issues of this case, all of which relate to the effect of Intel's actions on Intergraph's position in its own markets. There is substantial precedent discussing Sherman Act constraints with respect to a single firm's conduct toward another firm when there is no effect or threat of monopolization flowing from that conduct. In *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 774, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) the Court explained that "[b]ecause the Sherman Act does not prohibit unreasonable restraints of trade as such—but only restraints effected by a contract, combination, or conspiracy—it leaves untouched a single firm's anticompetitive conduct (short of threatened monopolization) that may be indistinguishable in economic effect from the conduct of two firms subject to § 1 liability." *See Spectrum Sports,* 506 U.S. at 457, 113 S.Ct. 884 ("the notion that proof of unfair or predatory conduct alone is sufficient to make out the offense of attempted monopolization is contrary to the purpose and policy of the Sherman Act").

The conduct complained of is Intel's withdrawal or reduction of technical assistance and special benefits, particularly pre-release access to Intel's new products, in reaction to Intergraph's suit for patent infringement. However, the Sherman Act does not convert all harsh commercial actions into antitrust violations. Unilateral conduct that may adversely affect another's business situation, but is not intended to monopolize that business, does not vio-

late the Sherman Act. *See Levine v. Central Fla. Med. Affiliates, Inc.,* 72 F.3d 1538, 1555 (11th Cir.1996) ("To establish a violation of section 2 for attempted monopolization, 'a plaintiff must show (1) an intent to bring about a monopoly and (2)·a dangerous probability of success.'") (quoting *Norton Tire Co. v. Tire Kingdom Co.,* 858 F.2d 1533,˙1535 (11th Cir.1988)). Although Intergraph stresses the adverse effect on its business of Intel's proposed withdrawal of these special benefits, the record contains no analysis of the effect of such action on competition among manufacturers of graphics subsystems or high-end workstations. "The antitrust laws were enacted for 'the protection of *competition,* not *competitors,'" Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (emphasis in original) (quoting *Brown Shoe,* 370 U.S. at 320, 82 S.Ct. 1502). *See, e.g., Levine,* 72 F.3d at 1551 ("the antitrust laws are intended to protect competition, not competitors").

Defining the relevant market is an indispensable element of any monopolization or attempt case, *U.S. Anchor,* 7 F.3d at 994, for it is the market in which competition is affected by the asserted predatory or anticompetitive acts. It is the market in which sellers compete, based on products that are in competition with each other. *See Brown Shoe,* 370 U.S. at 325, 82 S.Ct. 1502 ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."); *Image Technical Servs., Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1202 (9th Cir.1997) ("The relevant market is the field in which meaningful competition is said to exist."); *SmithKline Corp. v. Eli Lilly & Co.,* 575 F.2d 1056, 1063 (3d Cir.1978) (the relevant market is the market wherein producers "have the ability—actual or potential—to take significant amounts of business away from each other").

The district court found that Intel possessed monopoly power in two "relevant markets": (1) the market for high-end microprocessors, and (2) the submarket of Intel microprocessors. Neither one is a market in which Intergraph and Intel are in competition with each other. Intergraph states that it competes in the microprocessor market by virtue of its Clipper patents. However, the patent grant is a legal right to exclude, not a commercial product in a competitive market. Intergraph abandoned the production of Clipper microprocessors in 1993, and states no intention to return to it. Firms do not compete in the same market unless, because of the reasonable interchangeability of their products, they have the actual or potential ability to take significant˙business away from each other. *U.S. Anchor,* 7 F.3d at 995.

The district court also mentioned the graphics subsystems market as a relevant market, describing Intergraph and Intel as competitors in that market, and finding that Intel has plans to enter the workstation market. There was neither evidence nor suggestion of monopoly power by Intel in these markets, or the willful acquisition or maintenance of monopoly power in Intergraph's market. We shall discuss the issue of Intel's entry into downstream markets in connection with the district court's finding of illegal "leveraging." However, the observation in *Ad–Vantage Telephone Directory Consultants, Inc. v. GTE Directories Corp.,* 849 F.2d 1336, 1348 (11th Cir.1987) is apt: "Here, where Ad–Vantage could prove that GTEDC and Ad–Vantage competed, *i.e.,* in the sale of national advertising, it could not prove that GTEDC was a monopolist. Where Ad–Vantage could prove that GTEDC was a 'monopolist,' *i.e.* in the sale of local advertising in its own directory, it could not demonstrate that Ad–Vantage *competed* with GTEDC. In order to demonstrate 'an area of effective competition' one must establish a competitive relationship. Ad–Vantage failed to do so." Intergraph has similarly failed to establish a competitive relationship.

Intel's conduct with respect to Intergraph does not constitute the offense of monopolization or the threat thereof in any market relevant to competition with Intergraph. The Sherman Act is a law in the public, not private, interest. And even if the district court's view of Intel as a monopolist were accepted, as stated in *Mr. Furniture Warehouse, Inc. v. Barclays American/Commercial Inc.*, 919 F.2d 1517, 1522 (11th Cir.1990), "to constitute a violation the monopolist's activities must tend to cause harm to competition; unrelated harm to an individual competitor or consumer is not sufficient."

We turn to consideration of the specific grounds on which the district court applied the Sherman Act to the relationship between these entities and, finding a likelihood of violation of the antitrust laws, awarded antitrust-type relief to Intergraph.

### The "Essential Facility" Theory

The "essential facility" theory of Sherman Act violation stems from *United States v. Terminal RR Ass'n*, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912), wherein a group of railroads formed an association that controlled the railroad terminals, bridges, and switching yards serving the City of St. Louis. The Court held that this association was formed for an anticompetitive purpose, that the railroad terminals, bridges, and yards were facilities essential to competing railroads, and that section 1 of the Sherman Act was violated. *See generally* ABA Section of Antitrust Law, *Antitrust Law Developments* 276 (4th ed.1997).

The district court found that "the Advance Chips Samples and advance design and technical information are essential products and information necessary for Intergraph to compete in its markets." Reasoning that "[t]he antitrust laws impose on firms controlling an essential facility the obligation to make the facility available on non-discriminatory terms," the court held that Intel's action in withdrawing these benefits violated the Sherman Act. As authority the district court cited *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *Aspen Skiing*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467; and *MCI Communications Corp. v. American Telephone & Telegraph Co.*, 708 F.2d 1081, 1132 (7th Cir. 1983).

Intergraph argues that the essential facility theory provides it with the entitlement, in view of its dependence on Intel microprocessors, to Intel's technical assistance and other special customer benefits, because Intergraph needs those benefits in order to compete in its workstation market. However, precedent is quite clear that the essential facility theory does not depart from the need for a competitive relationship in order to incur Sherman Act liability and remedy. *See, e.g., Caribbean Broadcasting Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1088 (D.C.Cir. 1998) (an antitrust claim on the essential facility theory requires that a monopolist who competes with the plaintiff in the monopolized market controls an essential facility, and refuses the plaintiff's request for access to the facility); *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 542 (9th Cir.1991) ("Stated most generally, the essential facilities doctrine imposes liability when one firm, which controls an essential facility, denies a second firm reasonable access to a product or service that the second firm must obtain in order to compete with the first."). In *Otter Tail Power, Aspen Skiing*, and *MCI Communications* the "essential facilities" denied to the plaintiffs were all controlled by competitors.

In *Otter Tail Power* an electric utility withheld access to its power transmission lines from municipalities that wanted to establish their own municipal power distribution systems. Otter Tail Power's use of its monopoly power as a regulated utility, to refuse to "wheel" competitive electricity over its lines, along with its refusal to sell wholesale power to the municipal systems, was held to violate section 2 of the Sherman Act. The Court also noted that Otter

Tail Power had entered into a series of territorial allocation schemes with other electric utilities, which were held to be *per se* antitrust violations.

In *Aspen Skiing* the owner of three of the four major ski areas in Aspen raised its revenue demands for continuing a joint lift ticket arrangement with the fourth ski area, such that it was tantamount to refusal to continue the joint ticket program. The Court upheld the jury instruction to determine whether Aspen Skiing "willfully acquired, maintained, or used [monopoly] power by anti-competitive or exclusionary means or for anti-competitive or exclusionary purposes," as well as the instruction that "a firm possessing monopoly power has no duty to cooperate with its business rivals" unless the purpose is predatory or anticompetitive. Having approved these premises and statements of law, the Court stated that it was "unnecessary to consider the possible relevance of the 'essential facilities' doctrine." 472 U.S. at 611 n. 44, 105 S.Ct. 2847.

In *MCI Communications*, 708 F.2d at 1132–33, the court enumerated the elements of liability under the "essential facilities" theory as "(1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." The courts have well understood that the essential facility theory is not an invitation to demand access to the property or privileges of another, on pain of antitrust penalties and compulsion; thus the courts have required anticompetitive action by a monopolist that is intended to "eliminate competition in the downstream market." *Alaska Airlines*, 948 F.2d at 544–45. *See MCI Communications, supra.* This understanding is seriously strained by the district court's holding that "reasonable and timely access to critical business information that is necessary to compete is an essential facility," although the asserted competition is in a different market. A non-competitor's asserted need for a manufacturer's business information does not convert the withholding of that information into an antitrust violation.

Although the viability and scope of the essential facility theory has occasioned much scholarly commentary, no court has taken it beyond the situation of competition with the controller of the facility, whether the competition is in the field of the facility itself or in a vertically related market that is controlled by the facility. That is, there must be a market in which plaintiff and defendant compete, such that a monopolist extends its monopoly to the downstream market by refusing access to the facility it controls. *See TV Communications Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir.1992) (relevant market must be proven for an essential facilities claim); *Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 494 (4th Cir.1986) ("The fact remains that a relevant market must be proven under any of these theories [including denial of access to an essential facility]"). Absent such a relevant market and competitive relationship, the essential facility theory does not support a Sherman Act violation.

Ignoring this weight of jurisprudence, Intergraph argues that violation of the Sherman Act under the essential facility theory does not depend on whether Intel and Intergraph are competitors in any market. That is incorrect. As we have discussed, the presence of a competitive relationship is fundamental to invoking the Sherman Act to force access to the property of another. *See Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 4, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958) ("the policy unequivocally laid down by the Act is competition"). Other than as a remedy for illegal acts, the antitrust laws do not compel a company to do business with anyone—customer, supplier, or competitor. *See American Key Corp.*, 762 F.2d at 1578 (the "antitrust laws do not compel a company to do business with anyone"). The notion that withholding of technical information and samples of pre-release chips violates

the Sherman Act, based on essential facility jurisprudence, is an unwarranted extension of precedent and can not be supported on the premises presented. The district court erred in holding that Intel's superior microprocessor product and Intergraph's dependency thereon converted Intel's special customer benefits into an "essential facility" under the Sherman Act. The court's ruling of antitrust violation can not be sustained on this ground.

Intergraph also phrases Intel's action in withholding access to its proprietary information, pre-release chip samples, and technical services as a "refusal to deal," and thus illegal whether or not the criteria are met of an "essential facility." However, it is well established that "[i]n the absence of any purpose to create or maintain a monopoly, the [Sherman] act does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919). *See also, e.g., Associated Press v. United States*, 326 U.S. 1, 15, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); *cf Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d· 1231 (1968) (an adjudicated monopolist's practice of leasing and refusing to sell its machinery was an instrument in the maintenance of monopoly power as against actual and potential competition, and violated the Sherman Act). Intel states that it continued to sell its products to Intergraph, that it did not refuse to deal with Intergraph as with any regular customer, and that the antitrust laws do not require it to give preferred treatment to a customer that is suing it.

Courts have recognized that "[t]he relationship between a manufacturer and its customer should be reasonably harmonious; and the bringing of a lawsuit by the customer may provide a sound business reason for the manufacturer to terminate their relations." *House of Materials, Inc.*

*v. Simplicity Pattern Co.*, 298 F.2d 867, 871 (2d Cir.1962); *see also Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 889–90 (9th Cir.1982) (noting absence of any case where refusal to deal in response to a customer's suit against a manufacturer has been deemed an unreasonable restraint of trade); *Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129, 134 n. 3 (5th Cir.1979) (court should not "be called upon to weld together two business entities which have shown a propensity for disagreement, friction, and even adverse litigation"). Although we have observed a few rulings wherein a court has, for example, barred the termination of a distributor during litigation, no case has held that the divulgation of proprietary information and the provision of special or privileged treatment to a legal adversary can be compelled on a "refusal to deal" antitrust premise.

A "refusal to deal" may raise antitrust concerns when the refusal is directed against competition and the purpose is to create, maintain, or enlarge a monopoly. For example, in *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951) the only newspaper in town refused to sell newspaper advertising to persons who also advertised on a competing radio station; this was held to be an attempt to monopolize the mass dissemination of all news and advertising, and to violate the Sherman Act. *See also, e.g., Data General Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1183–84 (1st Cir.1994) ("[A] monopolist's unilateral refusal to deal with its competitors (as long as the refusal harms the competitive process) may constitute *prima facie* evidence of exclusionary conduct in the context of a section 2 claim. A monopolist may nevertheless rebut such evidence by establishing a valid business justification for its conduct.") (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 483 n. 32, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992)).

Intergraph provided no support for its charge that Intel's action in withholding "strategic customer" benefits from Intergraph was for the purpose of enhancing Intel's competitive position. Although the district court found that there was a lack of business justification for Intel's actions, there was no showing of harm to competition with Intel; thus the need did not arise to establish the defense of business justification. As stated in *California Computer Products, Inc. v. International Bus. Mach. Corp.*, 613 F.2d 727, 744 (9th Cir.1979), a manufacturer is "under no duty to help [plaintiff] or other peripheral equipment manufacturers survive or expand." Absent a duty, justification is unnecessary.

To the extent that Intergraph has presented on this appeal, or the district court relied on, a theory of refusal to deal based on Intel's withdrawal of the special customer benefits (Intel continued to sell to Intergraph as a regular customer), a basis for violation of the antitrust laws has not been established.

### *Leveraging*

The district court held that Intel "has attempted to leverage its monopoly power in the 'X86' CPU market to prevent Intergraph from competing in the graphics subsystem and workstation markets and to control and dominate competition in these markets through discriminatory and favored agreements and understandings with some of Intergraph's competitors." The district court found that Intel was itself in the graphics subsystems market, for Intel "signed an agreement to purchase Chips & Technology Company, an experienced and successful producer of graphics chips and chip sets" and was in the process of developing a graphics chipset. The court held that these actions were an illegal leveraging of monopoly power in violation of the Sherman Act, and that this warranted the remedy imposed in the preliminary injunction.

Antitrust liability based on leveraging of monopoly power is a concept of imprecise definition, for the courts have varied in their requirements of the nature of the advantage obtained in the assertedly leveraged market. The district court relied on *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 275 (2d Cir.1979) for the position that the Sherman Act is violated if monopoly power in one market provides a "competitive advantage" in another market, whether or not there is an intent to create a monopoly in the second market. However, the district court appeared to view Intel's participation in, and planned entry into, the graphics workstation market as a *per se* Sherman Act violation, for there was no economic evidence or proffer concerning Intel's participation in the downstream market. As discussed by Professor Areeda, to establish illegal leveraging of monopoly power the challenged conduct must "threaten[ ] the [second] market with the higher prices or reduced output or quality associated with the kind of monopoly that is ordinarily accompanied by a large market share." 3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* & 652c, at 90 (1996). Absent an adverse effect in the second market, the Sherman Act would serve to restrain competition rather than promote it.

The concept of illegal leveraging arose in *United States v. Griffith*, 334 U.S. 100, 107–08, 68 S.Ct. 941, 92 L.Ed. 1236 (1948), wherein the Court explained that monopoly power can not be used "to beget monopoly" and "to gain a competitive advantage." The Second Circuit has rejected a broad reading of *Berkey Photo*, describing the statement quoted *supra* as "dictum" and holding in *Twin Laboratories, Inc. v. Weider Health & Fitness*, 900 F.2d 566 (2d Cir.1990) that Sherman Act violation based on leveraging requires a showing of "tangible harm to competition" in the second market. *See also AD/SAT*, 181 F.3d at 230 ("Although a plaintiff alleging monopoly leveraging is not required to demonstrate a substantial market share by the defendant, application of the doctrine is limited to those circumstances where the challenged conduct actually injures competition, not just competitors, in the second, non-monopolized market.")

■ Some circuits have explicitly rejected the standard stated in *Berkey Photo*. In *Fineman v. Armstrong World Industries, Inc.*, 980 F.2d 171 (3d Cir.1992) the court held that a section 2 leverage claim requires the use of monopoly power in the second market, and that a mere attempt to gain a competitive advantage is insufficient as a matter of law. In *Alaska Airlines*, 948 F.2d at 548–49, the Ninth Circuit stated that "the elements of the established actions for 'monopolization' and 'attempted monopolization' are vital to differentiate between efficient and natural monopolies on the one hand, and unlawful monopolies on the other. *Berkey Photo's* monopoly leveraging doctrine fails to differentiate properly among monopolies." The Eleventh Circuit approached the issue in *Aquatherm Indus., Inc., v. Florida Power & Light Co.*, 145 F.3d 1258, 1262 (11th Cir.1998), declining to "extend Berkey Photo to a situation in which a monopolist projects its power into a market it not only does not seek to monopolize, but in which it does not even seek to compete." In *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1503–04 (11th Cir. 1985) the court, citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 45, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), stated that the use of a position in one market to gain an advantage in another market is not an illegal market restraint unless "a significant fraction or buyers or sellers are frozen out of a market." The district court's ruling herein is not in accord with Eleventh Circuit precedent, for Intel's action affected only Intergraph, in a heavily populated competitive market.

■ Intergraph made no proffer to show that Intel possessed market power in either the graphics subsystems market or the workstation market. A manufacturer's plan to enter a downstream market is not a *per se* antitrust violation based on a theory of leveraging. An integrated business does not offend the Sherman Act by drawing on its competitive advantages of efficiency, experience, or reduced transaction costs, in entering new fields. These advantages are not uses of monopoly power. *See AD/SAT*, 181 F.3d at 230. Intergraph provided no evidence or proffer tending to show that "a necessary and direct result" of Intel's planned entry into these markets would have a prohibited effect within the meaning of the Sherman Act. Although the district court stated that this and other rulings "are based on the evidence received to this point," there must be evidence that would support, or be likely to support, at least *prima facie*, the court's rulings when they are implemented by preliminary injunction based on a determination of antitrust violation or the substantial likelihood thereof.

The district court's ruling that Intel's expansion into the computer workstation and graphics subsystems markets constitutes illegal leveraging appears to be based on a *per se* theory of future Sherman Act violation. It is an enlargement of antitrust theory and policy to prohibit downstream integration by a "monopolist" into new markets. The specter of Intel's resources and talent is not evidence of future Sherman Act violation. As we have discussed, the purpose of the antitrust laws is to foster competition in the public interest, not to protect others from competition, in their private interest. Intergraph cites section 16 of the Clayton Act, 15 U.S.C. '26, as authority for the district court's ruling. Section 16 authorizes action "against threatened loss or damage by a violation of the antitrust laws." The salutary purpose is to prevent antitrust injury before it happens. However, the conduct to be prevented must be such that if it occurred would violate the antitrust laws. Section 16 authorizes prevention of the consequences of antitrust violation; it does not create the violation.

The injunction can not be supported on a theory of illegal leveraging.

### Coercive Reciprocity and Tying

The district court found that Intel engaged in unlawful "coercive reciprocity," defined by the court as "the practice of using economic leverage in one market coercively to secure competitive advantage

in another," by its proposals to settle the patent dispute. The court referred to Intel's "overall course of conduct, including its tying of a continued supply to Intergraph of CPUs and technical information with its demand for Intergraph's relinquishment of its Clipper technology patents without costs to Intel." The court depicted Intel's proposals as a *per se* antitrust violation "because of its pernicious effect and economic similarity to illegal tying cases," in violation of both sections 1 and 2 of the Sherman Act.

The district court cited cases wherein economic leverage in one product was used to coerce dealing in another product. In *Betaseed, Inc. v. U & I Inc.,* 681 F.2d 1203, 1216 (9th Cir.1982) the court defined coercive reciprocity as a coerced reciprocal dealing "in which two parties face each other as both buyer and seller and one party agrees to buy the other party's goods on condition that the second party buys other goods from it." Illegal tying is similarly defined: "The essential characteristic of a invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp.,* 466 U.S. at 12, 104 S.Ct. 1551.

To violate the Sherman Act the entity that coerces reciprocal dealing must be a monopolist in one product and thus be positioned to require dealing in the coerced product, which but for the monopolist's coercion could be acquired elsewhere. Thus Betaseed, the only processor of sugar beets geographically accessible to the U & I company, conditioned the processing of U & I's beets on the purchase by U & I of Betaseed's beet seeds, thereby excluding competition in the market for beet seed. Similarly in *Spartan Grain & Mill Co. v. Ayers,* 581 F.2d 419, 424 (5th Cir.1978), also relied on by the district court, Spartan demanded that the producers of breeding chickens purchase Spartan chicken feed and chicks in order for Spartan to buy their eggs (the market in which it had power). These are classical examples of illegal coerced reciprocal dealing.

In contrast, Intel's various licensing proposals furthered no illegal relationship. It is Intergraph, not Intel, that owns the Clipper patents. To the extent that the record mentions these negotiations, it appears that Intergraph is interested in selling or licensing the Clipper patents, but has deemed Intel's various offers to be inadequate. Intel did not demand that Intergraph buy its products, and the record describes no market in which Intel's licensing proposals were shown to have distorted competition. *See Betaseed,* 681 F.2d. at 1220 ("The Supreme Court has indicated that whether a court invokes a *per se* or rule of reason analysis, the purpose of the analysis is to form a judgment about the competitive significance of the restraint.") (citing *National Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978)). Although the district court appeared to be concerned that in the license negotiations the parties did not negotiate as equals, the elements of Sherman Act violation do not inhere in failed negotiations.

The district court provided no explanation of its terse holding that Intel's proposal to trade a license under the Clipper patents for continuation of the "strategic customer" program violated both sections 1 and 2 of the Sherman Act. No conspiracy is identified, although "conspiracy is an essential element of all Section 1 violations," *American Key Corp.,* 762 F.2d at 1579 n. 8, and "specific intent to monopolize is a necessary element of a Section 2 offense of actual monopolization." *Id.* And as we have discussed, to violate section 2, conduct "is unlawful only when it threatens actual monopolization." *Copperweld,* 467 U.S. at 767–68, 104 S.Ct. 2731. For both sections, "[h]arm to competition is a necessary element of all private antitrust suits under Sections 1 and 2 of the Sherman Act." *American Key Corp., supra,* citing *Brunswick Corp. v. Pueblo Bowl–O–Mat,*

*Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

No threat or actual monopolization is asserted to flow from the various rejected patent license proposals. Commercial negotiations to trade patent property rights for other consideration in order to settle a patent dispute is neither tying nor coercive reciprocity in violation of the Sherman Act. Although the district court calls Intel's actions "hardball," it is not the judicial role to readjust the risks in high-stakes commercial dealings. The district court erred in law in ruling that on the theories of coercive reciprocity and tying Intel *per se* violated sections 1 and 2 of the Sherman Act. The antitrust-based remedy here imposed can not be supported on these theories.

### Use of Intellectual Property To Restrain Trade

■ In response to Intel's argument that its proprietary information and pre-release products are subject to copyright and patents, the district court observed that Intel's intellectual property "does not confer upon it a privilege or immunity to violate the antitrust laws." That is of course correct. But it is also correct that the antitrust laws do not negate the patentee's right to exclude others from patent property. *See Cygnus Therapeutics Sys. v. ALZA Corp.,* 92 F.3d 1153, 1160, 39 USPQ2d 1666, 1671 (Fed.Cir.1996) ("The patent statute grants a patentee the right to exclude others from making, using, or selling the patented invention.") The patent and antitrust laws are complementary, the patent system serving to encourage invention and the bringing of new products to market by adjusting investment-based risk, and the antitrust laws serving to foster industrial competition. *See Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 866–67, 228 USPQ 90, 100–01 (Fed.Cir.1985) (the purpose of the patent system is to "encourage innovation and its fruits"; the purpose of the antitrust laws is "to promote competition"). The patent and antitrust laws serve the public in different ways, both of importance to the nation.

The district court stated that "[u]nlawful 'exclusionary conduct can include a monopolist's unilateral refusal to license a [patent or] copyright or to sell a patented or copyrighted work,'" quoting from *Image Technical Services.* This quotation, however, is part of a longer passage which imparts a quite different meaning:

> Under the fact-based approaches of *Aspen Skiing* and *Kodak,* some measure must guarantee that the jury account for the procompetitive effects and statutory rights extended by the intellectual property laws. To assure such consideration, we adopt a modified version of the rebuttable presumption created by the First Circuit in *Data General,* and hold that "while exclusionary conduct can include a monopolist's unilateral refusal to license a [patent or] copyright," or to sell its patented or copyrighted work, a monopolist's "desire to exclude others from its [protected] work is a presumptively valid business justification for any immediate harm to consumers."

*Image Technical Servs.,* 125 F.3d at 1218 (alterations in original). In *Image Technical Services* the Ninth Circuit reported that it had found "no reported case in which a court had imposed antitrust liability for a unilateral refusal to sell or license a patent or copyright." 125 F.3d at 1216. Nor have we. In accord is the joint statement of the United States Department of Justice and Federal Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* 4 (1995) that market power does not "impose on the intellectual property owner an obligation to license the use of that property to others." *Id.* at 4. *See* 35 U.S.C. § 271(d)(4) ("No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following: ... (4) refused to license or use any rights to the patent"). *See also, e.g., Miller Insituform, Inc. v. Insituform of North Am., Inc.,* 830 F.2d 606, 609 (6th Cir.1987) ("A patent

holder who lawfully acquires a patent cannot be held liable under section 2 of the Sherman Act for maintaining the [market] power he lawfully acquired by refusing to license the patent to others."); *United States v. Westinghouse Electric Corp.*, 648 F.2d 642, 647–48 (9th Cir.1981) (patent holder has the "untrammeled" right to license or not, exclusively or otherwise); *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1206–07 (2d Cir.1981)

▮ Further, Intergraph is not seeking a license under Intel's patents and copyrights, but a preferred position as to the products that embody this intellectual property before they are commercially available, as well as access to trade secrets. In *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 161, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989) the Court recognized that trade secrets are of value only before the products embodying them are commercially available. Intergraph seeks technical information that is not generally known, samples of new products before they are available to the public, and individualized technical assistance. However, as we have stated, the owner of proprietary information has no obligation to provide it, whether to a competitor, customer, or supplier. Precedent makes clear that a customer who is dependent on a manufacturer's supply of a component can not on that ground force the producer to provide it; there must also be an anticompetitive aspect invoking the Sherman Act. In *Eastman Kodak*, for example, Kodak and the independent service organizations were in direct competition in the market for servicing Kodak's photocopiers and micrographic equipment; the Court assumed, for the purpose of reviewing a grant of summary judgment, that Kodak had the intent to limit competition in the service market and that it succeeded in doing so. 504 U.S. at 455, 458, 112 S.Ct. 2072. The district court herein recognized that there must be an anticompetitive intent, but ignored the absence of competition between Intel and Intergraph.

The district court's conclusory statement that Intel was using its intellectual proper-ty to restrain trade was devoid of evidence or elaboration or authority. A Sherman Act violation can not be so imprecisely invoked.

### The Conspiracy Theory

The district court found that Intergraph was likely to prove that sections 1 and 2 of the Sherman Act were violated by Intel in conspiring with Intergraph's OEM competitors, by aiding them in customer presentations and assistance on the asserted condition that the customer would deal with the OEM that made the presentation, and not with Intergraph. The district court characterized this action as an effort to "persuade Intergraph's customers to boycott Intergraph."

▮ Intel readily concedes that it participates in presentations with workstation producers, and apparently had done so in conjunction with Intergraph in the past. To establish a boycott under section 1 there must be an illegal agreement in restraint of trade; we have been directed to no showing where a customer was required to agree not to deal with Intergraph in order to receive Intel's presentation. *See United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) ("The essence of [a conspiracy to monopolize] is an agreement entered into with the specific intent of achieving monopoly. . . .").

▮ Section 2 prevents persons from "combining or conspiring with any other person or persons, to monopolize any part of the trade or commerce"; such a claim requires deliberate concerted action with the specific intent to achieve an unlawful monopoly, accompanied by acts in furtherance of the conspiracy. Intel states, without challenge by Intergraph, that there is no evidence that its presentations had any effect on actual or potential monopolization in this field. On the evidence presented, a violation of section 2 was not supported. *See* Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and its Practice* 266 (1994)

("If a monopoly manufacturer sells to fifty retailers, and then arbitrarily cuts one of them off, the retail market will remain competitive. There is no plausible way that such a refusal can result in a lower output or higher prices.")

The federal antitrust laws "do not create a federal law of unfair competition or 'purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.'" *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993) (quoting *Hunt v. Crumboch*, 325 U.S. 821, 826, 65 S.Ct. 1545, 89 L.Ed. 1954 (1945)). The record states that Intergraph's market contains many competitors, with no significant entry barriers. Absent illegal conduct or an adverse effect on competition, Intel's customer presentations are devoid of antitrust significance. *See American Key Corp.*, 762 F.2d at 1579 (injury to competition, as distinguished from injury to a competitor, is essential to a Sherman Act claim).

The events here complained of do not state an antitrust claim, whether or not they may state a claim under some other theory. In *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 119 S.Ct. 493, 498, 142 L.Ed.2d 510 (1998) the Court, on different facts, cautioned against judicial adoption of a *per se* rule of antitrust liability that would "transform cases involving business behavior that is improper for various reasons ... into treble-damages antitrust cases." Although undoubtedly judges would create a kinder and gentler world of commerce, it is inappropriate to place the judicial thumb on the scale of business disputes in order to rebalance the risk from that assumed by the parties.

*The Non–Disclosure Agreements*

In 1994 Intel and Intergraph entered into the first of a series of non-disclosure agreements concerning the protection of Confidential Information as defined therein. The Agreements provide that "Neither party has any obligation to disclose Confidential Information to the other," that there is no "obligation to buy or sell products," that both parties may "cease giving Confidential Information to the other party without liability," and that either party can "terminate this Agreement at any time without cause upon notice to the other party" with return of the Confidential Information. Under these agreements Intel provided Intergraph with the trade secret and proprietary information and pre-release products here at issue.

 The district court ruled that "Intel's retaliatory lawsuits and the threatened and actual termination of its non-disclosure agreements (NDAs) with Intergraph, under which Intel provided technical information to Intergraph, constitute unlawful restraints of trade." The court held that Intel could not terminate the agreements and the provision of Confidential Information thereunder, since there was no legitimate business justification for doing so. The court concluded that "Intel's enforcement of the at-will termination provisions through two retaliatory lawsuits and other threatened actions is unreasonably onerous and intended to restrain competition by Intergraph and others." However, onerous actions do not in themselves constitute antitrust violations, *see Brooke Group*, 509 U.S. at 225, 113 S.Ct. 2578 ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws.") As the Court stated in *Hunt v. Crumboch*, 325 U.S. 821, 826, 65 S.Ct. 1545, 89 L.Ed. 1954 (1945), "[The Sherman] Act does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce." *See Spectrum Sports*, 506 U.S. at 459, 113 S.Ct. 884 ("The concern that § 2 might be applied so as to further anticompetitive ends is plainly not met by inquiring only whether the defendant has engaged in 'unfair' or 'predatory' tactics.")

 The district court also ruled that the at-will termination clause was "unconscionable" at the time the non-disclosure agreements were entered into, or at least would be unconscionable if Intel were now

permitted to terminate the agreements and discontinue the disclosures they had enabled. The district court rejected the argument that unconscionability as a ground of contract illegality was intended for consumer protection, and held that "the principle applies with equal force in the commercial field." We observe, however, that the Alabama courts, like others, have emphasized that "[r]escission of a contract for unconscionability is an extraordinary remedy usually reserved for the protection of the unsophisticated and the uneducated." *Wilson v. World Omni Leasing, Inc.*, 540 So.2d 713, 717 (Ala. 1989). Although Intergraph is a much smaller company than Intel, it is one of the Fortune 1000, and does not plead inadequate legal advice in its commercial dealings. The Alabama Code comments that "The principle is one of the prevention of oppression and unfair surprise and not of disturbance of allocation of risks because of superior bargaining power." Ala.Code § 7–2–302 Comment (1) (1997). Applying this state law, the Alabama courts have recognized that "it is not the province of the court to make or remake a contract for the parties." *Muscle Shoals Aviation, Inc. v. Muscle Shoals Airport Auth.*, 508 So.2d 225, 228 (Ala.1987).

Trade secrets and other proprietary information and products including pre-release samples of chips are commercial property, and the terms of their disclosure and use are traditional matters of commercial contract. Intergraph does not state that it objected to the mutual at-will termination provision when the contract was entered. Indeed, the district court found that when Intergraph switched from the Clipper technology "Mr. Grove did not commit Intel to provide a perpetual supply of chips, pre-released chips, or confidential information [and] did not commit Intel to any continued or 'perpetual business relationship' with Intergraph."

■ In an agreement relating to confidential information, negotiated between commercial entities, it is not the judicial role to rewrite the contract and impose terms that these parties did not make. Such intrusion into the integrity of contracts requires more than changed relationships. No fraud or deception is here alleged. Even on the district court's view of the mutual termination clause as unconscionable, the remedy would be rescission or imposition of a termination notice period, not the Sherman Act remedy of enforced disclosure of trade secrets and proprietary information and provision of pre-released products, none of which is required to be disclosed under any agreement. Neither the conclusion that the termination of the agreements violated the Sherman Act, nor the content of the injunction, can be supported on the ground that the non-disclosure agreements contained a termination at-will provision.

■ Alternatively, the district court held that since the non-disclosure agreements lacked a termination date, the court could impose one. The court ruled that "reasonable notification would take effect at the conclusion of the Deschutes and Merced Programs continuing through 1999." This reformation, adding some twenty months to the date of the court's injunction Order, is not accompanied by an analysis of the original understanding of the parties or by evidence of objective termination parameters for similar agreements, and is without precedent. Although the weight of this aspect has been diluted by the passage of time and other events,[3] this judicial revision of the parties' contract is without support.

■ Non-disclosure agreements were apparently also involved in connection with Intel's refusal to authorize help to Intergraph for removal of a "bug" or defect in a product, an event described by the district

3. We take notice that a consent order, reported to provide some of the same relief as does the preliminary injunction, has been entered by the Federal Trade Commission. *Intel Corp.*, Docket No. 9288 (FTC March 1999) (Agreement Containing Consent Order). That proceeding, under Section 5 of the FTC Act, 15 U.S.C. § 45, is not before us.

court as "requiring Intergraph to spend substantial time and resources to solve the problem and delaying Intergraph's product entry into the market." The withdrawal of technical service is not a violation of the antitrust laws. As stated in *Brooke Group*, 509 U.S. at 225, 113 S.Ct. 2578, even when the parties are in competition with each other "an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws." [4]

### The March 1997 Letter

The district court also ruled that Intel had contractually committed itself to continue to provide Intergraph with preferred customer benefits. This ruling was based on a letter written by an Intel representative in March 1997, when Intergraph was beginning to inform the OEMs about the Clipper patents. The letter stated that Intergraph would be treated as "a strategic customer in present and future programs" that are "currently being managed under Non–Disclosure Agreements." The district court considered this letter to be in conflict with and thus to supersede the non-disclosure agreements, rendering "illusory" the termination-at-will provision of the agreements and requiring Intel to provide strategic customer benefits into the future.

 The district court found that this letter is likely to be established as an enforceable contract "of a sufficiently definite duration." Recognizing the absence from the letter of basic contract terms, for the letter contained no statement of obligations, duration, price, quantity, etc, the district court held that the Alabama UCC "gap-filler" rules could be used to create a binding contract. Thus the district court held that the duration was "at least through 1999, when the Merced program is publicly launched, and perhaps through the year 2000." However, the letter's broad usages, its lack of specificity, and its

silence on virtually all of the elements of a contract, negate its interpretation as replacing the non-disclosure agreements with specific obligations, and separate it from the sort of document subject to a "gap-filler" expedient. Ala.Code §§ 7–2–305 to 310. There is no gap-filling exercise that can reasonably include all of the terms of the district court's injunction order.

Thus we do not share the district court's view of this letter as changing and replacing the non-disclosure agreements as to major contractual provisions. Indeed, the letter refers to the terms of the current non-disclosure agreements as governing future relationships. Although the letter may be viewed as one of reassurance to Intergraph, the letter by its terms did not supersede the non-disclosure agreements. The judicial obligation in document interpretation is to attempt to determine the mutual intent at the time, but not to impose an interpretation that would be likely to have been rejected at the time. Whatever the correct reading of this letter, it can not be read as binding Intel to new substantive obligations that were not mentioned in the letter.

The preliminary injunction can not be sustained on the ground that it is simply implementing the Intel letter of March, 1997.

### Everything Taken Together

Intergraph argues that the various theories of antitrust liability discussed by the district court should not be viewed separately but should be taken together, lest the slate be "wiped clean" after each aspect fails to violate the Sherman Act, citing *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). In *Continental Ore* the Court held that the "factual components" of a case should be viewed together, not the pieces of legal theory. *Id.* at 699. *Continental Ore* did not hold,

---

4. The district court also described this event as a breach of warranty. Evidence on this issue is not provided. Intergraph's claim in

this suit, and the relief awarded, is not for breach of warranty, but for antitrust violation.

as Intergraph proposes, that the degrees of support for each legal theory should be added up. Each legal theory must be examined for its sufficiency and applicability, on the entirety of the relevant facts. The proper analytical approach was explained in *City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921, 928–29 (2d Cir.1981): "Even though many of the issues the municipalities raise are interrelated and interdependent, however, we must, like the municipalities' briefs, analyze the various issues individually. Moreover, we reject the notion that if there is a fraction of validity to each of the basic claims and the sum of the fractions is one or more, the plaintiffs have proved a violation of section 1 or section 2 of the Sherman Act."

### Conclusion

Despite the district court's sensitive concern for Intergraph's well-being while it conducts its patent suit against Intel, there must be an adverse effect on competition in order to bring an antitrust remedy to bear. The remedy of compulsory disclosure of proprietary information and provision of pre-production chips and other commercial and intellectual property is a dramatic remedy for antitrust illegality, and requires violation of antitrust law or the likelihood that such violation would be established. In the proceedings whose record is before us, Intergraph has not shown a substantial likelihood of success in establishing that Intel violated the antitrust laws in its actions with respect to Intergraph, or that Intel agreed by contract to provide the benefits contained in the injunction. The preliminary injunction is vacated.

### Costs

Costs to Intel, Fed. Cir. R. 39.

*INJUNCTION VACATED*