## In re REMERON ANTITRUST LITIGATION

### In re Remeron Direct Purchaser Antitrust Litigation

#### Walgreen Co., et al., Plaintiffs,

v.

#### Organon, Inc. and Akzo Nobel N.V., Defendants.

#### CVS Meridian, Inc. and Rite Aid Corp., Plaintiffs,

v.

#### Organon, Inc. and Akzo Nobel N.V., Defendants.

Nos. 02–2007 (FSH), 03–0085(FSH), 03–222(FSH), 03–5488(FSH).

United States District Court,
D. New Jersey.

Sept. 8, 2004.

Lisa J. Rodriguez, Trujillo, Rodriguez & Richards, LLC, Haddonfield, NJ, for Plaintiffs and Defendants.

Kevin J. McKenna, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, PC, Newark, NJ, for Defendants.

Michael Lieberman, Hangley Aronchick Segal & Pudlin, Philadelphia, PA, for Plaintiffs.

## OPINION

HOCHBERG, District Judge.

### INTRODUCTION

This matter comes before the Court upon Defendants Organon USA Inc. and Akzo Nobel N.V.'s (collectively "Organon") consolidated motion to dismiss Plaintiffs' antitrust claims pursuant to Fed.R.Civ.P. 12(b)(6). The Court has considered the written submissions of the parties pursuant to Fed.R.Civ.P. 78.

### BACKGROUND

Organon manufactures the antidepressant drug mirtazapine, commercially marketed as Remeron, which was originally claimed in its now-expired United States Patent No. 4,062,848 (the "'848 patent"). Adding its patent and regulatory exclusivities, Organon's exclusive right to manufacture and sell mirtazapine expired on June 14, 2001.

On November 2, 1999, Organon was granted United States Patent No. 5,977,-099 (the "'099 patent") for a method of treating depression using a combination of mirtazapine and a selective serotonin reuptake inhibitor ("SSRI"). In January 2001, fourteen months after being granted the '099 patent, Organon submitted the '099 patent to the United States Food and Drug Administration (the "FDA") for listing in the APPROVED DRUG PRODUCTS WITH THERAPEUTIC EQUIVALENCE EVALUATIONS (the "Orange Book").[1]

Beginning in February 2001, several generic drug manufacturers (the "Generics") filed Abbreviated New Drug Applications ("ANDAs") with the FDA, seeking approval for their generic version of mirtazapine. The Generics each filed a certification, under 21 U.S.C. § 355(j)(2)(A)(vii)(IV) (the "Paragraph IV Certifications"), which stated that the '099 patent was invalid or would not be infringed by their generic version of mirtazapine.

Subsequently, Organon sued the Generics for inducement to infringe the '099 patent. Because Organon sued each of the Generics within forty-five days of receipt

---

1. The FDA lists the patent numbers in the Orange Book that the New Drug Application ("NDA") identifies as being associated with that NDA.

of the Paragraph IV Certifications, FDA approval of the generic ANDAs was automatically stayed by operation of the Hatch–Waxman Act and would remain stayed until the earlier of thirty months or a judicial determination that the '099 patent was invalid or not infringed. *See* 21 U.S.C. § 355(j)(5)(B)(iii). On December 18, 2002, this Court ruled that the Generics' sale of mirtazapine did not induce infringement of the '099 patent. *See Organon Inc. v. Teva Pharms., Inc.,* 244 F.Supp.2d 370 (D.N.J.2002) ("*Organon I* ").

The Generics filed counterclaims against Organon for antitrust violations under the Sherman Act. *Organon Inc. v. Mylan Pharms., Inc.,* 293 F.Supp.2d 453 (D.N.J. 2003) ("*Organon II* "). These claims include: 1) improperly listing the '099 patent in the Orange Book; and 2) baselessly initiating patent infringement actions against the Generics.[2] On December 3, 2003, this Court granted Organon's motion to dismiss the Generics' antitrust claims based on the grounds that: 1) the language of 21 U.S.C. §§ 355(b)(1), (c)(2) and

21 C.F.R. § 314.53(b) "gave Organon a reasonable basis for listing in the Orange Book"; and 2) Organon had an objective basis to believe it could assert a claim of patent infringement with a reasonable calculation of a favorable outcome.[3] *Organon II,* 293 F.Supp.2d at 459, 461. This Court made clear, however, that it had not ruled on whether a late listing claim could survive a motion to dismiss. In April of 2004, the Generics settled their counterclaims against Organon.

In the instant action, Plaintiffs, the direct purchasers of mirtazapine, filed amended antitrust complaints against Organon alleging "an overall scheme" to monopolize the relevant market, claiming that when taken together, the allegations against Organon constitute an antitrust violation, even if the individual allegations are found to not violate antitrust laws. Their complaints alleged also that: 1) Organon obtained the '099 patent through fraud on the PTO; 2) Organon improperly listed the '099 patent in the Orange Book; 3) Organon baselessly initiated patent infringement actions in *Organon I;*[4] and 4)

**2.** The Generics also filed a counterclaim alleging fraudulent procurement of the '099 patent from the U.S. Patent and Trademark Office ("PTO") based on *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), but this Court reserved judgment on that issue because it was not part of Organon's motion to dismiss in that case.

**3.** Until the Federal Circuit decided *Warner–Lambert Co. v. Apotex Corp.,* 316 F.3d 1348 (Fed.Cir.2003), holding that Hatch Waxman does not permit an action for induced infringement in a case with facts mirroring those in *Organon I,* it was not clear that the patent infringement actions were lacking in merit.

**4.** Improper listing and institution of sham litigation have already been dismissed by this Court in *Organon II.* The court has considered *Aro Mfg. Co. v. Convertible Top Replace-*

*ment Co.,* 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961), and *Gen. Foods Corp. v. Studiengesellschaft Kohle,* 972 F.2d 1272 (Fed.Cir.1992), both cited by Plaintiffs and holding that a combination patent covers only the entire patent and not individual elements. This Court, however, already addressed the issue in *Organon II* and will not re-open the issue.

Although the direct purchasers were not parties in *Organon II,* in the present action they are barred from raising the improper listing and sham litigation claims by the doctrine of collateral estoppel, which prevents a plaintiff from re-litigating a previously adjudicated issue in subsequent suits based on a different cause of action involving a party to the prior litigation. *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). Even if the present action were considered an extension of *Organon II,* the doctrine of law of the case would apply to bar the direct purchasers from raising the im-

Organon improperly delayed listing the '099 patent in the Orange Book for the purpose of extending their monopoly on the mirtazapine market.[5] This fourth claim is premised on the allegation that, had Organon listed the '099 patent within 30 days after its issuance (December 2, 1999) as is required by FDA rules, the Generics could have filed Paragraph IV certifications as early as June 15, 2000. Because the '099 patent was not listed in the Orange Book until February 1, 2001, however, the first ANDAs for generic mirtazapine were not filed until February 28, 2001, and the Hatch–Waxman contesting process was delayed. As a result, Organon gained an extended period of market exclusivity. This "late listing" claim is among Plaintiffs' antitrust allegations in the instant case.

## STANDARD

### A. Motion to Dismiss

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) should be granted "if it appears to a certainty that no relief could be granted under any set of facts which could be proved." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir.1997). While a court need not credit a complaint's "bald assertions" or "legal conclusions," it is required to accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff. *Id.* (citing *Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir.1989)); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429–30 (3d Cir.1997).

### B. Antitrust Claims

The Supreme Court has dictated that an antitrust injury is a type of injury the antitrust laws were intended to prevent and also one that is a result of a defendant's unlawful conduct. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). The purpose of the Sherman Act is "to protect the public from the failure of the market." 15 U.S.C.A. § 2 n. 4, quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 113 S.Ct. 884, 892, 122 L.Ed.2d 247 (1993).

The offense of monopolization under Section 2 of the Sherman Act has two elements: 1) the possession of monopoly power in the relevant market; and 2) the willful acquisition or maintenance of that power, as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). A specific intent to monopolize is not required for a court to find a Section 2 violation. The "completed offense of monopolization ... demands

proper listing and sham litigation claims. *See generally Arizona v. California*, 460 U.S. 605, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983).

**5.** Plaintiffs Louisiana Wholesale Drug Company, Inc. ("LWD") and Meijer, Inc. ("Meijer") alleged that Organon, to obtain the financial benefits of a six-month extension of market exclusivity for the purpose of pediatric testing, had submitted a proposal for testing to be performed on pediatric patients. (Organon moved to dismiss the "pediatric claim," and Plaintiffs did not address Organon's argument in their opposition brief.) Organon, however, did not receive the six-month period of exclusivity because its proposal was not approved. Because Plaintiffs did not oppose the motion with respect to the "pediatric" claim, and because no proofs of anti-competitive effects flowing from Organon's attempt to obtain an exclusivity extension for pediatric testing have been proffered by Plaintiffs, this Court hereby dismisses LWD and Meijer's "pediatric testing" claim. *See United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C.Cir.2001) (examining the effects of, rather than the intent behind, an alleged monopolist's conduct in assessing antitrust violations).

only a general intent to do the act, for 'no monopolist monopolizes unconscious of what he is doing.' " *Times–Picayune Publ'g Co. v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 97 L.Ed. 1277 (1953) (distinguishing monopolization claim from "attempted monopolization" claim which requires showing of specific intent to destroy competition).

## DISCUSSION

### A. "Overall Scheme" Claim

■ The Direct Purchasers contend that Organon undertook an overarching scheme to delay generic competition for mirtazapine and that the actions of an alleged monopolist must be viewed in their totality, not in isolation. Organon counters that because none of its actions individually was illegal, taken together they cannot constitute an "overall scheme" to hinder competition, citing *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346 (Fed. Cir.1999), in which the court declined to view a series of activities "together" and found that since each legal theory upon which antitrust claims were based was insufficient, they could not add up to anticompetitive behavior as a whole. *Id.* at 1366–67.

The *Intergraph* court, however, held that a group of *factual allegations* may be viewed in their totality, even while pieces of *legal theory* may not be added up and taken as a whole. *Id.* (citing *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962) (holding that the factual components of a case should be viewed together)); *see also LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir.2003) (declaring that "the relevant inquiry is the anti-competitive effect of [the defendant's] exclusionary practices considered together," and that "courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation."). Further clarifying

what may constitute an "overall scheme" claim, the court in *Intergaph* explicitly rejected "the notion that if there is a fraction of validity to each of the basic claims and the sum of the fractions is one or more, the plaintiffs have proved a violation of section 1 or section 2 of the Sherman Act." *Intergraph Corp.*, 195 F.3d at 1367 (quoting City of Groton v. Connecticut Light & Power Co., 662 F.2d 921, 928–29 (2d Cir. 1981)). Because the "overall scheme" claim rests upon determinations that flow from factual allegations, this Court shall reserve judgment on this issue at this stage of the litigation. *See Morse*, 132 F.3d at 906.

### B. Walker Process Fraud Claim

■ Fraudulent procurement of a patent or the enforcement of a patent obtained by fraud may provide the basis for Sherman Act Section 2 liability if the other elements of a Sherman Act claim are present. *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). The elements of a *Walker Process* fraud claim are:

1. A false representation or deliberate omission of a fact material to patentability

2. made with the intent to deceive the patent examiner

3. on which the examiner justifiably relied in granting the patent, and

4. **but for** which misrepresentation or deliberate omission the patent would not have been granted.

*C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1364 (Fed.Cir.1998), emphasis added.

The parties dispute whether Plaintiffs have adequately alleged but-for causation and whether their complaint meets the heightened pleading requirements of Fed. R.Civ.P. 9(b). This Court finds it unnecessary to decide these issues, however, be-

cause the Plaintiffs do not have standing to bring a *Walker Process* fraud claim. Plaintiffs, as direct purchasers, 1) never had the '099 patent enforced against them, 2) were never threatened with such enforcement, and 3) were not in a position to manufacture a competing generic version of mirtazapine.

■ A plaintiff does not have standing to assert a *Walker Process* claim unless "[the] defendant had sought to enforce the patent against plaintiff, or that plaintiff had some reasonable basis for fearing such attempted enforcement." *Carrot Components Corp. v. Thomas & Betts Corp.*, 229 U.S.P.Q. 61, 64 (D.N.J.1986). The *Carrot Components* court reasoned that a party does not gain standing to assert a *Walker Process* claim until the patent holder has taken some action to enforce the patent against that party. *Indium Corp. of Am. v. Semi–Alloys, Inc.*, 566 F.Supp. 1344, 1352–53 (N.D.N.Y.1983). The *Indium* court subsequently reversed its position and held *sua sponte* that a competitor that was not sued for patent infringement could still have a *Walker Process* claim. *See Indium Corp. of Am. v. Semi–Alloys Inc.*, 591 F.Supp. 608, 614 (N.D.N.Y.1984) ("*Indium II* "). In *Indium II,* the court extended *Walker Process* standing to those who "were ready, willing, and able to produce the article and would have done so but for the exercise of exclusionary power

by the defendant." *Id.* Plaintiffs here lack standing under the reasoning of *Indium II.*

Plaintiffs assert that they sued Defendants not "for defrauding the PTO, but for monopolizing the market for mirtazapine-based prescription drugs," and that standing for a monopolization claim arises under Section 4 of the Clayton Act. Pls.' Mem. Opp. at 26. *Walker Process* and its progeny involve antitrust counterclaimants who were potential or actual competitors in patent infringement suits. In this case, Plaintiffs, as direct purchasers, neither produced mirtazapine nor would have done so; moreover, Plaintiffs were not party to the initial patent infringement suits. Plaintiffs may not now claim standing to bring a *Walker Process* claim by donning the cloak of a Clayton Act monopolization claim. Accordingly, this Court finds that Plaintiffs do not have standing to assert *Walker Process* fraud claims against Organon.[6]

## C. Late Listing as an Alleged Antitrust Violation [7]

■ The remaining issue in the instant motion is Plaintiffs' allegation of "late listing" in the Orange Book, which they do have standing to assert. Organon filed its Orange Book listing fourteen months after the issuance of the '099 patent (December

---

**6.** Plaintiffs, however, may bring antitrust claims on other grounds even though they are not direct competitors of Organon. *See In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 400 (3d Cir.2000) (class plaintiffs pharmaceutical purchasers could sue for antitrust violations because: 1) class alleged injury by unlawful restraint on market competition; 2) no risk of duplicative recovery; and 3) Plaintiffs were necessary and foreseeable victims of defendant DuPont's effort to exclude generic competition).

**7.** Defendants argue that the "late listing" claim should be issue precluded because this

Court has stated that the language of 21 U.S.C. §§ 355(b)(1), (c)(2) and 21 C.F.R. § 314.53(b) "gave Organon a reasonable basis for listing in the Orange Book." *Organon II*, 293 F.Supp.2d at 459. *Organon II*, however, addressed broadly the issue of improper listing of the '099 patent in the Orange Book, and did not address the *timing* of the listing. A "late listing" claim, therefore, is not precluded. This Court so informed Organon from the bench shortly after *Organon II* was issued, and all parties have thus known that *Organon II* did not address the antitrust theory of "late listing."

2, 1999). FDA regulations, however, expressly require that if a patent is issued which claims an approved drug (or approved use thereof), then the NDA holder shall:

> within 30 days after the date of approval of its application or supplement, ... submit [for Orange Book listing] for each patent that claims the drug substance (active ingredient), drug product (formulation and composition), or approved method of use.

21 C.F.R. § 314.53(c)(2)(ii).

 Organon contends that Plaintiffs should be barred from raising late-listing in the instant action, relying upon *Verizon Communications v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004) (barring a monopolization claim for breach of a statutory duty to aid competitors under the Telecommunications Act of 1996).[8] In *Trinko*, the Supreme Court cautioned against expanding Sherman Act Section 2 liability when such expansion has the potential to conflict with the duties imposed by a separate regulatory scheme. *Id.* at 881. In the instant case, Organon argues, relying on *Trinko*, that the FDA's regulation of the Orange Book process[9] and the Hatch–Waxman Act should override the Sherman Act, thereby barring Plaintiffs' late listing antitrust claim.

In *Trinko*, the statutory subject was the Telecommunications Act of 1996, which is a complete regulatory scheme that grants regulators significant power to enforce rules and to issue penalties.[10] *Id.* By contrast, the FDA regulators have (and choose to exert) significantly less authority over Orange Book listings because the Hatch–Waxman Act places the power to decide which patents to list on the private company that holds the NDA. *See* 21 C.F.R. § 314.53(f).[11] The FDA, in a December 12, 2000 brief regarding the listing of the drug BuSpar, explained its role in the Orange Book process:

> [T]he FDA's mission is to protect the public by ensuring that drugs are safe and effective. Congress did not intend FDA to divert its attention from this mission by spending enormous resources attempting to resolve economic disputes about the coverage of patent claims. For this reason, Congress explicitly required FDA to publish patent information upon its submission, and for any such disputes ... to be resolved by pri-

---

8. The Telecommunications Act of 1996 required large incumbent phone carriers (such as AT & T) to share enough physical and network space with small entrants into the market to promote reasonable competition.

9. FDA regulations contemplate the possibility of the late-listing of patents. *See* 21 C.F.R. § 314.94(a)(12)(vi). If a patent on the listed drug is issued and the holder of the approved application for the listed drug does not submit the required information on the patent within 30 days of issuance of the patent, an applicant who submitted an ANDA that contained an appropriate patent certification ... is not required to submit an amended certification. 21 C.F.R. § 314.94(a)(12)(vi). However, the FDA has neither disallowed late-listing nor implemented any regulatory mechanism to address its market exclusivity repercussions, thus leaving such matters for private litigation.

10. "Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue.... [C]areful account must be taken of the pervasive federal and state regulation characteristic of the industry." *Trinko*, 124 S.Ct. at 881.

11. The FDA publishes all submissions for Orange Book listing. Any party who disputes listed patent information may register its dispute with the FDA, which subsequently requests the patent holder to confirm its accuracy. Unless the application holder "withdraws or amends its patent information in response to FDA's request, the agency will not change the patent information in the list." 21 C.F.R. § 314.53(f).

vate litigation between interested parties. (internal citations omitted).

Fed. Defs.' Mem. in Opp'n to Pls.' Mot. for Prelim. Injunction at 20–21, *Mylan v. Thompson,* 139 F.Supp.2d 1 (D.D.C.2001). The FDA, nevertheless, recognizes that, late listing poses a danger of anti-competitive conduct. According to FDA commentary:

> Even if the NDA holder is unsuccessful in defending the late-filed patent, it will have extended its period of market monopoly in a manner inconsistent with the intent of Congress.... By requiring timely filing of patent information, the agency hopes to permit judicial resolution of patent disputes without unduly extending the innovator's period of patent protection.

59 Fed.Reg. 50338–01 (October 3, 1994). The Hatch–Waxman Act itself contemplates that matters arising out of patent disputes would be settled by the courts and not the FDA.

■ In the instant case, there exists no regulatory scheme so extensive as to supplant antitrust laws. As the Supreme Court noted, "when there is nothing built into the regulatory scheme which performs the antitrust function, the benefits of antitrust are worth its sometimes considerable disadvantages." *Trinko,* 124 S.Ct. at 881. Although a statutory directive such as the Sherman Act may be overridden by a contrary Congressional command, Organon bears the burden of showing that traditional antitrust laws have been supplanted by a separate statutory scheme. *See Shearson/Am. Express, Inc. v. McMahon,* 482 U.S. 220, 226–27, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987). No authority has been cited to support the proposition that the antitrust laws have been superseded by the Hatch–Waxman Act or by FDA

regulations. *Trinko* does not bar the instant antitrust claims.

■ Organon also contends that late-listing cannot constitute a monopolization claim as matter of law, and thus the claim must be dismissed for failure to state a claim. The offense of monopolization under Section 2 of the Sherman Act has two elements: 1) the possession of monopoly power in the relevant market; and 2) the willful acquisition *or maintenance* of that power as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident. *Grinnell,* 384 U.S. at 570–71, 86 S.Ct. 1698. Although a patent-holder lawfully acquires a monopoly power via the patent process, it subsequently may violate the second prong of the *Grinnell* test by unlawfully *maintaining* that monopoly power. *See Atari Games Corp. v. Nintendo of Am.,* 897 F.2d 1572, 1576 (Fed.Cir. 1990).

The Third Circuit has similarly held that improper use of a patent can be a Section 2 violation. *See SmithKline Corp. v. Eli Lilly & Co.,* 575 F.2d 1056 (1978).[12] In *United States v. Microsoft Corp.,* 253 F.3d 34 (D.C.Cir.2001), the D.C. Circuit observed principles which have emerged "from a century of case law on monopolization":

1. To be condemned as exclusionary, a monopolist's conduct must have anti-competitive *effect.* It must harm the competitive process and thereby harm consumers (harm to competitors alone will not suffice).

2. The plaintiff must prove that Defendant's conduct indeed has the requisite anti-competitive *effect.* Suits by private Plaintiffs must show that the injury was of the type the statute was

---

**12.** In *SmithKline,* defendants' violations included the bundling of certain products to extend a patent they held to other products for which they did not hold a patent.

intended to forestall, citing *Brunswick,* 429 U.S. at 487–88, 97 S.Ct. 690.

3. (Point 3 omitted.)

4. (Point 4 omitted.)

5. *"In considering whether the monopolist's conduct on balance ... is exclusionary for the purposes of Section 2, our focus is upon the effect of that conduct, not upon the intent behind it.* Evidence of the intent behind the conduct ... is relevant only to the extent it helps us understand the likely effect of the monopolist's conduct." *Id.* at 58 (emphasis added).

Within the maze of Hatch–Waxman, if a patent-holder's actions unlawfully maintain otherwise lawful monopoly power or use a lawful patent to manipulate the ANDA process, such actions could lead to anti-competitive effects in the relevant market. Of course, there are many hurdles along the way, including the very basic question of whether each drug is a "relevant market" if several drugs perform the same or similar function. At this stage in the instant action, it cannot be said to a legal certainty that no relief could be granted under Section 2. *See Morse,* 132 F.3d at 906.

### CONCLUSION

Assuming all of the allegations Plaintiffs' complaints to be true for purposes of this motion, Plaintiffs are entitled to offer evidence to support their claims that the late listing of the '099 patent had the effect of illegally extending market exclusivity in violation of Section 2 of the Sherman Act. Plaintiffs may also offer *facts* (as opposed to legal theories that have been issue precluded) to support their claim that Organon engaged in an "overall scheme" to thwart competition for generic mirtazapine. The *Walker Process* fraud, "pediatric testing," "improper listing," and "sham litigation" claims are dismissed.

The motion to dismiss is thus granted in part and denied in part. An appropriate order shall issue.

### ORDER

This matter having come before the Court upon Defendants Organon USA Inc. and Akzo Nobel N.V. (collectively "Organon") consolidated motion to dismiss Plaintiffs' antitrust claims pursuant to Fed. R.Civ.P. 12(b)(6); and the Court having considered the written submissions of the parties pursuant to Fed.R.Civ.P. 78; and for good cause shown

**IT IS** on this 8th day of September 2004, hereby

**ORDERED** that Defendants' Motion to Dismiss is **DENIED** in part, as to Plaintiffs' "overall scheme" and "late listing" claims; and it is further

**ORDERED** that Defendant's Motion to Dismiss is **GRANTED** in part, as to Plaintiffs' Walker Process fraud, "pediatric testing," "improper listing," and "sham litigation" claims.